IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HOSAKOTE M. NAGARAJ, <br><br> Plaintiff, <br><br> vs. <br><br> THE PHYSICIAN NETWORK, <br><br> Defendant. | 4:20-CV-3021 <br><br> MEMORANDUM AND ORDER |

The plaintiff, Hosakote M. Nagaraj, alleged in his complaint, claims concerning; (1) "race, color, sex, and/or national origin" discrimination pursuant to Title VII, 42 U.S.C. § 2000e, and the Nebraska Fair Employment Practices Act (NFEPA), Neb. Rev. Stat. § 48-1114; (2) discrimination due to "race, ethnicity and/or ancestry" pursuant to 42 U.S.C. § 1981; (3) retaliation for reporting unlawful discrimination pursuant to 42 U.S.C. § 1981; and (4) breach of the parties' written employment agreement. Filing 1-1. The defendant, The Physician Network, moves for summary judgment pursuant to Fed. R. Civ. P. 56. Filing 44. For the reasons that follow, the Court will grant in part, and deny in part, the defendant's motion.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. BACKGROUND

The plaintiff is a board-certified interventional cardiologist who was employed by the defendant from July 2012, until January 15, 2018. Filing 53-1 at 7; filing 1-1 at 5-6. The defendant is a Nebraska corporation and a subsidiary of Catholic Health Initiatives (CHI), and functions as a network of community-based healthcare providers. Filing 44-1 at 6. At all times, the parties' employer/employee relationship was defined by an employment agreement. The relevant agreement for the purposes of this matter was signed on April 3, 2014, with an effective date of November 1, 2014. Filing 56 at 3; filing 54-1 at 29-47.

The agreement provided for an initial three-year term, which would automatically renew for additional one-year terms unless either party notified the other in writing, at least ninety days prior to the expiration of the current term, of an intent to not renew the agreement. Filing 54-1 at 33. The agreement

contained a provision that allowed the defendant to immediately terminate the agreement for cause upon the occurrence of any of nineteen different events, omissions, or failures. Filing 54-1 at 33-35. One such failure concerned a physician's failure to comply with the *Directives* or the *CHI Standards of Conduct*, both of which were referenced in Exhibit C. Filing 54-1 at 35. Exhibit C, titled "Additional Provisions," was an attachment to the agreement and contained eighteen additional provisions, one of which was that the physician/employee must conduct themselves at all times in compliance with the *CHI Standards of Conduct* as set forth in *Our Values & Ethics at Work Reference Guide*. Filing 54-1 at 44-45.

A meeting was held on April 7, 2016, concerning the plaintiff's interactions with a coworker. Filing 44-3 at 109; filing 53-1 at 15. In attendance at the meeting were Dr. Peter Dionisopoulos, the defendant's Chief Medical Officer; Lisa Zeis, Senior Human Resources Business Partner; and Trish Wilmes, Vice President of Operations. Filing 44-1 at 8. The coworker was a registered nurse structural heart coordinator who had reported that the plaintiff asked her to document something in a patient's record that made her very uncomfortable, so she refused the plaintiff's request. Filing 44-3 at 109. She reported that after refusing the plaintiff's request, she experienced increasing difficulties working with the plaintiff, and that the plaintiff began going to a different coordinator who was not responsible for the procedures and patients. *Id.*

The plaintiff recalled that at this meeting, Dionisopoulos discussed the positive contributions that the plaintiff had made over the past two years. Filing 53-1 at 15. With respect to the scheduling nurse's allegations, the plaintiff recalled Dionisopoulos emphasizing the importance of professionalism and teamwork. Filing 53-1 at 16. The plaintiff, for his part, disputed the

3

accuracy of the scheduling nurse's claims, and accused her of playing favorites by preferentially sending the surgeries to other doctors. Filing 53-1 at 16; filing 44-3 at 109.

On February 8, 2017, an individual contacted the defendant's "Ethics Point" ethics-at-work hotline complaining that the plaintiff's conduct created a hostile work environment. Filing 44-3 at 110-11. The complainant alleged that the plaintiff was best described as hostile and passive-aggressive, that the plaintiff believed it's him against everyone else despite everyone else wanting to work as a team. Filing 44-3 at 111. According to the complainant, the plaintiff complains and believes everything should be done differently, and discredits the efforts of others. Everyone walks around on eggshells fearing that they will upset the plaintiff more than he already is on a regular basis. The complainant believed that the plaintiff's behavior brings down morale and was not conducive to a healthy workplace.

On February 13, Corporate Responsibility Officer Delinda Lampe forwarded the Ethics Point complaint to Dionisopoulos and Zeis for their review. Filing 44-3 at 116. Dionisopoulos responded that same day. He told Lampe that he and Zeis met with the plaintiff last summer regarding similar behavior, and asked Lampe to set up a meeting with the three of them to determine what steps to take regarding the plaintiff's ongoing behavior. *Id.* When the meeting didn't occur, Dionisopoulos contacted Lampe on February 28 about his concerns not being addressed. Filing 44-3 at 114. Dionisopoulos gave Lampe the names of several staff members to talk to, and indicated that the situation with the plaintiff had grown worse. *Id.*

Lampe provided summaries of her interviews with seven individuals. Each individual provided similar accounts of the plaintiff's actions and behaviors. The plaintiff, according to one interviewee, created a very stressful

4

and hostile work environment—it was like walking on eggshells. He yells at staff, and on one occasion got into a loud shouting match with another physician, causing a staff member to step between the two doctors, concerned that a physical fight was about to occur. Another interviewee felt that the plaintiff was dangerous. Another interviewee said they wouldn't let the plaintiff perform any procedure on a family member. Yet another interviewee said that the plaintiff put patients at risk. This interviewee said that the plaintiff "steals" patients by having the scheduler switch patient appointments from other doctors to him. One such patient, after learning of a switch, called in angry and demanded to know why he was switched. The plaintiff would leave every evening with a container of used medical equipment, which he sent to India. One interviewee said that the plaintiff would order a particular stent for a procedure, and then during the procedure remove the stent because it was too long and order a different one. The plaintiff would then take the used stent home. Several interviewees said that the plaintiff is not to be questioned, and that he thinks he is god. Several also indicated that the plaintiff's behavior had gotten increasingly worse, and that the physicians and staff were tired of the situation and want it dealt with. Lampe reported that there were more individuals she spoke with, and they all echoed what the seven interviewees she summarized had said about the plaintiff. Filing 44-3 at 114-15.

On March 7, 2017, the plaintiff was given a document titled "corrective action" which indicated that this was the plaintiff's final warning. Filing 44-3 at 118. The corrective action notified the plaintiff that he has not met the standards of performance or conduct by; failing to treat peers with respect, stealing patients, exhibiting arrogance, acting disrespectful toward staff, and documented instances of stealing equipment. The expectations for improvement were for the plaintiff to treat staff and patients respectfully,

5

review the *Mission and Core Values* document, and appropriately discard equipment according to protocols. In the space allocated for an employee's comments, the plaintiff wrote: "All the allegations are one sided and without giving an opportunity for me to present my case." The plaintiff also indicated that he felt disrespected by the administration, but had never brought it up before.

On January 9, 2018, the defendant received two reports regarding the plaintiff's behavior. The first report concerned a call the plaintiff made on January 8 to a staff member. The plaintiff, purportedly, was screaming and yelling about scheduling concerns, and accused the staff member of purposefully sabotaging his days in the defendant's Columbus, Nebraska clinic. Filing 44-3 at 120. The plaintiff's yelling went on for around five minutes without allowing the staff member to respond. When the staff member tried to explain the situation to the plaintiff, he hung up. The staff member reported feeling threatened, and at one point during the plaintiff's yelling, she began to cry. *Id.*

The second reported incident concerned similar conduct. On January 9, the plaintiff called the staff member who was responsible for sending him his schedule, and complained that he had not received his schedule for the past two days. Filing 44-3 at 125. The plaintiff purportedly threatened her job, told her she was lazy, and spoke for six straight minutes without letting her explain herself. The staff member said she felt that she was being yelled at, and started crying after she got off the phone.

On January 15, the plaintiff was called to a meeting with Dr. Barry Hoover, Wilmes, and a human resources representative. Filing 53-5 at 24. Hoover, at this time, was the defendant's interim president. The plaintiff was told about the latest complaints, and reminded that he had previously been

6

given a final warning about his behaviors. Filing 53-1 at 22. The plaintiff disputed the accuracy of the allegations. Filing 56 at 5. Hoover gave the plaintiff two options—he could resign, or his contract would be terminated for cause.[1] The next day, the plaintiff sent an email to Hoover which read; "I am herby (sic) submitting my resignation for the job." Filing 44-3 at 128.

## III. DISCUSSION

### 1. DISCRIMINATION CLAIMS

The plaintiff alleges discrimination based on race, sex, color, or national origin pursuant to Title VII, 42 U.S.C. § 1981, and the NFEPA.[2] An employee's discrimination claim will survive a motion for summary judgment if the employee produces direct evidence of discrimination, or creates an inference of unlawful discrimination pursuant to the *McDonnell Douglas* burden-shifting analysis. *Turner v. Gonzales*, 421 F.3d 688, 694, (8th Cir. 2005). A prima facie discrimination claim under a *McDonnell Douglas* analysis has four elements, which are: (1) The employee belonged to a protected class; (2) he was qualified to perform his job; (3) he suffered an adverse employment action; and (4) he was treated differently from similarly situated employees. *Id.* Here, the

---

[1] The plaintiff argues that he was told he could resign, or his employment *would* be terminated for cause. Filing 56 at 5. Wilmes agreed with the plaintiff's counsel when she was asked if Hoover gave the plaintiff the opportunity to resign, and if he did not, his contract *was going to be* cancelled. Filing 53-5 at 25. Hoover, however, recalled that the plaintiff was told that his contract *could* be terminated if he didn't resign. Filing 53-3 at 7. The Court must view the evidence in the plaintiff's favor, and as such, will accept Wilmes' recollection that the plaintiff was told his contract *was going to be* terminated if he did not resign.

[2] Discrimination claims under Title VII, 42 U.S.C. § 1981, and NFEPA share a common analysis. *Elis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 777 n.3 (8th Cir. 2012).

defendant concedes the first two elements—that the plaintiff is a member of a protected class and was qualified to perform his job. Filing 44-1 at 13.

With respect to the third element, the defendant asserts that the plaintiff cannot make out a prima facie case of discrimination because he did not suffer an adverse employment action. Filing 44-1 at 13-15. The defendant acknowledges that the plaintiff was provided with the option that he could resign, or if he chose not to resign, he could be terminated for cause. Filing 44-1 at 14. Nonetheless, the defendant argues that the plaintiff's resignation was a voluntary choice on his part. According to the defendant, it would be pure speculation whether the defendant would have actually terminated the plaintiff's employment had he not voluntarily resigned. *Id.*

A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would resign as a result. *Kerns v. Capital Graphics, Inc. Inc.,* 178 F.3d 1011, 1017 (8th Cir. 1999). Here, the defendant provided the plaintiff with two options, both of which led to the same result—the termination of his employment. Two choices that lead to the same outcome does not present one with the opportunity to voluntarily select an outcome. Selecting one option over another cannot be viewed as voluntarily selecting an outcome, when either option leads to the same result (i.e. termination).

Here, whether a reasonable person in the plaintiff's shoes would have found his conditions of employment intolerable is a question of fact. The plaintiff contends that he was disliked and disrespected by staff, other physicians, and the administration. He claims that the complaints regarding his behavior were false or inaccurate, but credited by the administration

8

without allowing him the opportunity to tell his side of the story. He also contends that the conduct of other physicians was much worse that the conduct he was accused of, but those physicians were not singled out for termination. A jury must decide whether that the plaintiff's claims regarding the conditions of employment are plausible and can be attributed to the defendant, and if so, whether those conditions made the plaintiff's employment intolerable.

But that is only half of the question. The other half is whether the defendant intended to force the plaintiff to resign or could have reasonably foreseen that he would resign as a result of the choices that were presented. *Kerns*, 178 F.3d at 1017. Telling an employee that he will be fired for cause does not, in and of itself, constitute constructive discharge. *Summit v. S-B Power Tool, (Skil Corp), a Div. of Emerson Elec. Co.,* 121 F.3d 416, 421 (8th Cir. 1997). Here, the plaintiff wasn't merely told he will be fired for cause, and then in response the plaintiff elected to resign. Here, at least according to the plaintiff, the defendant specifically gave him the option of being fired or resigning. It is plausible that a reasonable jury could conclude that the defendant intended to force the plaintiff's hand and have him resign by giving him the option of resigning or have his contract terminated for cause. It would also be plausible for a jury to conclude that it would be reasonably foreseeable, given the options that were on the table, that the plaintiff would select resignation rather than face a fight over termination for cause. Further, the plaintiff contends that the discrimination he faced made the conditions of his employment intolerable, which is also a question for a jury to resolve. The evidence, viewed in the plaintiff's favor (as the Court must at this stage), indicates that he was not merely told, in and of itself, that he would be fired for cause.

9

The Court finds that there are questions of fact for a jury to resolve regarding whether the plaintiff's resignation constitutes an adverse employment action.

Next, the defendant argues that even if the plaintiff's resignation was an adverse employment action, the defendant had "a legitimate, non-discriminatory reason for giving Plaintiff the option, as a professional courtesy, to resign." Filing 44-1 at 16. Under *McDonnell Douglas,* once the plaintiff makes a prima facie case for discrimination, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's termination. *Canning v. Creighton Univ.,* 995 F.3d 603, 611 (8th Cir. 2021). Although the defendant's burden is not onerous and does not require proof by a preponderance of the evidence, a defendant still must provide an explanation of its legitimate reason that is clear and reasonably specific. *Id.*

The defendant has clearly articulated reasonably specific reasons for giving the plaintiff the option to either resign or have his employment terminated for cause. The defendant argues that the plaintiff had four ethics complaints made against him in less than three years. Filing 44-1 at 16. The complaints were all similar—allegations that the plaintiff was abusive toward staff and that his conduct created a hostile work environment. An investigation of the second complaint, in which at least seven additional staff members were interviewed, substantiated the allegations in the complaint and the plaintiff was issued a final written warning. Less than a year later, two more complaints were made showing that the plaintiff had not corrected his behavior. The decision was made by the defendant's interim president, Dr. Hoover, to give the plaintiff the option to resign or, potentially, face termination of his employment for cause.

10

After an employer produces a legitimate, nondiscriminatory reason for termination, the burden shifts back to the employee to show that the proffered reason was not the true reason for discharge because it was merely a pretext for discrimination. *Canning*, 995 F.3d at 611. In general, a plaintiff may show that a proffered reason for termination was pretextual in two ways. *Fiero v. CSG Systems, Inc.*, 759 F.3d 874, 878 (8th Cir. 2014). First, a plaintiff may rebut the factual basis for the employer's explanation, showing the explanation to be unworthy of credence. *Id.* Second, a plaintiff may show that the employer's proffered reason was not the true reason, but rather, an impermissible motive was more likely the real reason for the employer's action. *Id.*

Here, the plaintiff argues that the disparate treatment other physicians received who did not share the plaintiff's race, color, national origin, or gender is proof that an impermissible motive was behind his forced resignation. Filing 56 at 31-36. Instances of disparate treatment can support a claim of pretext, but a plaintiff will have the burden of proving that he and the disparately treated others were similarly situated. *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994).

Employees are similarly situated only when they are similarly situated in all relevant respects, and are involved in or accused of the same conduct, but are disciplined in different ways. *Carter v. Pulaski Cty. Special Sch. Dist.*, 956 F.3d 1055, 1058 (8th Cir. 2020). The test for determining whether other employees are similarly situated to a plaintiff is a rigorous one. *Fiero*, 759 F.3d at 879. Nonetheless, the search is for substantially similar employees, not for clones. *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013). To demonstrate that employees are similarly situated, a plaintiff need only

11

establish that he was treated differently than other employees whose violations were of comparable seriousness. *Id*.

The plaintiff argues that there were at least four physicians who were reported to have been repeatedly abusive toward staff. Filing 56 at 31-35. Those physicians, unlike the plaintiff, were either white skinned, not native to India, or female. Dr. Dionisopoulos, who was chief medical officer and had oversight with respect to the defendant's cardiology practice (filing 53-3 at 5), identified that two of those physicians were heart surgeons who were notorious for yelling and belittling staff in the operating room. Filing 53-2 at 14-16. Dionisopoulos identified another doctor in this group, a female physician, for whom it was common for staff to complain about her yelling, as well as for belittling and degrading comments she made to staff. Filing 53-2 at 9. Unlike the plaintiff, these physicians only received verbal counseling or "coaching" regarding their behaviors. *See* filing 53-2 at 22-23; filing 53-5 at 27-30. Further each physician allegedly continued to mistreat staff after their counseling sessions.

The defendant argues that the plaintiff and the four physicians identified were not similarly situated because the plaintiff was an interventional cardiologist and the others were cardiac surgeons or cardiologists. Filing 44-1 at 17-18. The defendant doesn't explain how these distinctions speak to why these physicians were treated differently for conduct that was arguably of comparable seriousness. The defendant also points to a gap of almost two years between complaints regarding the female physician, whereas the plaintiff had complaints in three consecutive years. The plaintiff disputes the accuracy of this claim, and cites to evidence in the record in support. Filing 56 at 7.

12

The defendant argues that there were three Ethic Point reports lodged against the plaintiff, and only one lodged against the female physician. Further, the plaintiff was placed on final written warning, and the female physician was never placed on final written warning. Filing 44-1 at 18. But these differences seem to bolster the plaintiff's argument—the female physician's violations, which were arguably of comparable seriousness to the allegations about the plaintiff's conduct, were treated differently.

The defendant makes additional arguments in its reply brief. First, the defendant argues that some of the physicians that the plaintiff identified as similarly situated were males, which, according to the defendant, undercuts the argument that the plaintiff was treated differently because of his gender. Filing 57 at 5. But the plaintiff's argument is that he was treated differently because of several factors, one of which was his gender. He does not argue that all males were treated differently. Further, the defendant argues any inference of discrimination on account of national origin is negated by the fact that an East Indian male surgeon was accused of violations regarding conduct that was arguably of comparable seriousness to the plaintiff's conduct, but was treated more leniently than the plaintiff. Again, the plaintiff's argument isn't that all physicians who share his national origin were discriminated against. His argument is only that he faced discrimination because of several factors, one being his national origin. [3]

---

[3] In a footnote, the defendant also argues that the plaintiff failed to show that the other physicians were similarly situated because there is no evidence that all physicians were supervised by the same individual, and that all physicians' contracts were the same. However, the deposition testimony in evidence is otherwise. Dr. Hoover testified that all of the defendant's employees were held to the same standards of conduct and behavior across

13

Some of the plaintiff's claims may be less plausible than others based on the weight of the evidence. But at this juncture, the Court cannot say that as a matter of law, a reasonable jury could not find that the plaintiff was unlawfully discriminated against, and that the defendant's reasons for forcing his resignation were a mere pretext to effect the unlawful termination of his employment.

2. RETALIATION

The plaintiff's complaint alleges a claim for retaliation pursuant to 42 U.S.C. § 1981. Section 1981 secures for all persons, "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." Section 1981 encompasses retaliation claims. *CBOCS W., Inc v. Humphries,* 553 U.S. 442, 451 (2008); *Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014). In the absence of direct evidence of retaliation, a prima facie § 1981 retaliation claim under a *McDonnell Douglas* analysis requires a plaintiff to demonstrate that (1) the plaintiff engaged in protected activity, (2) the plaintiff's employer subsequently took materially adverse action against the plaintiff, and (3) the materially adverse action was causally linked to the plaintiff's protected activity. *Robinson v. American Red Cross*, 753 F.3d 749, 756 (8th Cir. 2014).

The plaintiff asserts that with respect to the first element, "it is undisputed" that the plaintiff reported and attempted to report discriminatory conduct. Filing 56 at 37. However, the evidence cited by the plaintiff falls short of showing that the plaintiff attributed what he believed to be discrimination,

---

the board. Filing 53-3 at 3. Hoover also testified that all of the defendant's contracts with its physician-employees contained the same boilerplate language. Filing 53-3 at 13. Further, Dr. Dionisopoulos was the Chief Medical Officer with oversight on the defendant's cardiology practice. Filing 53-3 at 5.

14

to a racial, ethnic, skin color, or national origin animus. For example, the plaintiff alleged that the person who scheduled surgeries was giving preference to two white doctors, and that the plaintiff raised his concerns with his immediate supervisor, Dr. Dionisopoulos. Filing 53-1 at 11-12. When specifically asked whether he used the word "discrimination" when advising Dionisopoulos of his concerns, the plaintiff said, "I did not use discriminated to him. But the message I gave him, that person—the scheduler, is scheduling these surgeries preferentially with doc surgeons rather than me." Filing 53-1 at 12.

The plaintiff also complained to the individual responsible for scheduling vacations that other doctors were getting their preferred vacation times when his request for vacation during spring break was denied. Filing 53-1 at 24. But when asked whether he told the scheduler that he believed she was discriminating against him on the basis of race, sex, or national origin, the plaintiff said no, he just told her she was discriminating. *Id.* The plaintiff claims that he attempted to tell Dr. Hoover about these incidents of what he believed were discrimination, but Hoover would immediately shut the conversation down. Finally, the plaintiff asserts that Wilmes, who together with Hoover forced him to resign, was a person "who knew everything." Filing 53-1 at 30. But when asked directly whether he reported illegal activity to Wilmes, or whether he ever used the word "discrimination" when talking to her, the plaintiff said that he didn't remember using that word, but he gave her a very clear message about the differences in treatment he believed he was receiving. Filing 53-1 at 29.

The testimony cited by the plaintiff, when taken in context, fails to adduce proof showing, or even giving rise to a reasonable inference, that the plaintiff reported to anyone that the discrimination he believed he was

15

suffering was linked to the plaintiff's race, skin color, national origin, or ethnicity. As such, the plaintiff has failed to show that he had engaged in protected activity. Further, the plaintiff's evidence does not indicate that the defendant's president, Dr. Hoover, or Wilmes, a highly placed CHI administrator, [4] were ever informed that the plaintiff believed that the discrimination he allegedly experienced was predicated on an unlawful motive. Also absent is testimony or evidence that Hoover or Wilmes knew or should have known that the plaintiff had complained to others about unlawful discrimination.

An employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation. *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008). Here, the Court finds that the plaintiff has failed to adduce evidence establishing a prima facie retaliation claim in that the discrimination that the plaintiff purportedly told Hoover or Wilmes about, or the plaintiff's complaints of discrimination they knew or should have about from other sources, was unlawfully predicated on the plaintiff's race, color, national origin, ethnicity, or gender.

### 3. BREACH OF CONTRACT

The plaintiff alleged in his complaint that the defendant breached the parties' written employment agreement by failing to provide a ninety-day notice of non-renewal before terminating his employment agreement. Filing 1-1 at 8. The defendant argues that it did not breach the employment agreement

---

[4] Wilmes was vague in identifying her precise title, however she did testify that she was an employee of CHI, was responsible for CHI's cardiac services in Nebraska, had leadership over the clinic with the Nebraska Heart Hospital, and at some point held the title of Chief Administrative Officer. Filing 53-5 at 4-5.

as a matter of law because the plaintiff resigned, and the defendant cannot be held liable for a contract breach when the plaintiff is the one who cancelled the agreement. Filing 44-1 at 21.

The Court finds that the plaintiff is conflating two separate subsections of the employment agreement. Section 7.1 provides that subject to earlier termination as provided in the agreement, the agreement is for a three-year initial term, and shall be automatically extended for additional one-year periods unless either party notifies the other party of an intent to not renew the agreement. Filing 54-1 at 33. The notice must be in writing and provided at least ninety days prior to the expiration of the current term. *Id*. In his complaint, the plaintiff's allegations concerning breach of contract are predicated on a breach of § 7.1.

However, the defendant's threat to terminate the plaintiff's employment agreement was made pursuant to § 7.2. This provision allows the defendant to immediately terminate the employment agreement upon the occurrence of nineteen acts or omissions. *Id.* One such act or omission, § 7.2(m), concerns a physician's failure to comply with the *CHI Standards of Conduct*.

The Court finds that the defendant's argument that there is no contract breach because the plaintiff resigned to be unpersuasive. The plaintiff resigned because he was given the option to resign, or have the employment agreement terminated for cause—something which the defendant was permitted to do pursuant to § 7.2. If anything, the plaintiff's claim could have been for the defendant's anticipatory breach of the employment agreement.

But in any event, the termination of the plaintiff's employment was not a violation of the non-renewal provision of § 7.1 as the plaintiff alleged in his complaint. Termination of the plaintiff's employment was, arguably, either allowed pursuant to § 7.2(m) of the employment agreement, or was the result

17

of the plaintiff's decision to resign. Termination of his employment was not the result of the defendant's decision to not renew the plaintiff's employment agreement pursuant to § 7.1 as alleged in the plaintiff's complaint.

## IV. CONCLUSION

Some of the plaintiff's claims may be less plausible than others based on the weight of the evidence. But the Court cannot say, as a matter of law, that no reasonable jury could find that the plaintiff's discrimination claim had merit. Accordingly, the defendant's motion for summary judgment regarding the plaintiff's discrimination claim is denied. The defendant's motion regarding the plaintiff's retaliation and breach of contract claims is granted.

IT IS ORDERED:

1. Defendant's motion to dismiss (filing 44) is granted in part and denied in part as set forth above.

2. The plaintiff's retaliation and breach of contract claims are dismissed.

3. This matter is referred to the Magistrate Judge for case progression.

Dated this 19th day of July, 2021.

BY THE COURT:

*[signature]*

John M. Gerrard
United States District Judge